Good morning, Your Honors. I'd like to reserve five minutes for rebuttal, although I don't even anticipate using 15 minutes. The basic issue here is whether or not the Second Amendment complaint put the defendant on notice of facts that could give rise to a claim for relief. There are two points I want to make that aren't really focused on in the briefs. Other than that, I think the briefs pretty well speak to what our argument is. Basically, in March of 2003, our client, who has a contract with T-Mobile to negotiate cell phone rates and deals, entered into a contract with the defendant. The defendant is a large corporation that has a need for a large number of cell phone usage. They signed a confidentiality and a non-compete agreement basically saying that the defendant will not use the information other than through their collaboration with my client. They then, a couple months later, enter into a written contract where my client is given the non-exclusive right to represent them to negotiate this deal. And where you – it's an integration and you wipe out all prior agreements. That's what they're contending. And there is an integration clause in the contract, although we don't believe it applies to this particular deal because it says relating to the subject matter of that particular contract and a non-compete agreement is a little bit different than a right to represent agreement. Kennedy. Isn't the language used non-exclusive? Yes, Your Honor. Not just non-compete. The non-exclusive – well, there's a non-compete agreement and a separate non-exclusive right to represent agreement. So yes, Your Honor, you are correct in that. But what we are arguing is – so they enter into the second agreement. Then my client analyzes 29,000 phone bills for them, gives them free cell service, and then what does the defendant do? They go out on their own and negotiate a deal directly with T-Mobile. Let me ask you this question. It may not be important in the long run, but to me it seems to be a rather puzzling part of this. You're – as far as I'm concerned, your best argument is the procuring cases. But you don't allege – this is – you have three complaints, I think. This is the second amended? Yes, Your Honor. I don't find any allegation anywhere that the – your client ever obtained the kind of a deal that was acceptable or a deal that was close to what was ultimately negotiated. Now, is there an – or any suggestion by you that in the briefs or anywhere that you could amend the complaint to say that he had successfully obtained the kind of a deal that would be acceptable? Maybe it was inartful in our pleading, but, Your Honor, that is my understanding that they did get the very deal that we negotiated. They just went around our backs to get it. Well, if you negotiated the very deal and they then accepted that deal but simply went and signed it directly, that's a different case than you have presented up to now. Well, in some ways, I think it's the same case, although I think it's an even stronger case. But the reality is they took all of our information, all of our confidential information. I know they took the information, and I know that you went out and negotiated some kind of terms. But from reading everything you've submitted to us, there's nothing that suggests that the kind of terms you obtained for them had any relationship to the kind of deal they actually signed. Well, then, that would have been inartful pleading, and at the very least, I would request entity to amend the complaint to you. You had an opportunity already once, didn't you? Yes, Your Honor.  Now, I do want to focus on why the second one. Are you telling us that if you had an opportunity to amend a complaint, you would allege that the deal they signed was identical to or very basically the same deal? Substantively the same, yes, Your Honor. And let me just bring another point where the question is whether you should have that opportunity. As Judge Bieser points out, you have had it in the past and didn't do it. And I don't want to mislead anyone with my questions, but I was curious as to what would happen if you did. Well, Your Honor, there's a real issue that, frankly, defendants put in issue as to whether or not the non-exclusive right to represent them even was effective. And if Your Honors will look at, and this is what's not pointed out in the brief too well, page 53 of the record on appeal, where plaintiffs argue, where a defendant argues that plaintiff never signed the contract, but it's undeniable from the face of the document that it was not binding until executed by an authorized representative for each party. But I think that wasn't that as to the first complaint. It seemed to me that on the succeeding complaints that they, your opponents  Well, I think they dropped it because of the first complaint. Certainly did on appeal. Well, obviously they dropped it because they're taking the position that the second contract, its non-exclusive nature. Clearly, if the second contract is gone, they have no argument about the first contract. But you were the ones that alleged that this contract with the non-exclusive term in it was a contract. Right. And there's something inherently wrong. So how can you now argue that it wasn't? Well, I think it was. I think there was a contract that was entered into. But, you know, there's something inherently wrong with a company that goes to someone and says, okay, do all of this work for us. Analyze 29,000 of our phone bills. We're going to give you the right to represent us. There's a non-exclusive right. A non-exclusive right. But there's still an implied covenant of good faith and fair dealing that neither party will do anything to deprive the other person of the benefit of the bargain. So they take all of our work, all of our analysis, all of our confidential information, and then thumb their noses at us and go off and do the same substantively same deal with someone else and cut us out of a seven-figure commission. Aren't you on notice when they say we're not going to give you an exclusive right? We're going to retain the right to do it ourselves if we want. Aren't you on notice at that point? No, Your Honor. I don't think you are. What I think you're on notice of is that we're going to talk to you, Total Coverage, but we're also going to talk to Cell Phone Service over here, and we're going to talk to Singular, and we're going to talk to L.A. Cellular, and we're going to look who's the best deal. So you are negotiating this deal. We're going to talk over here. But what we're not on notice of is that. No, but it was a non-exclusive right to negotiate with this particular company. Yes. Not that we're going to go to other companies. Yes, but nowhere in there does it say they're going to represent themselves. Nowhere in there does it say. No, it doesn't. But they – I mean, it's a very peculiar term to put in a deal where you're the agent to negotiate with whatever, T-Mobile. And that's where good faith has to come in. And that's where good faith has to come in. They're not going to – You know where good contract drafting has to come in. Well, I think there's some issues with the contract. And I think, really, and then another thing that's not on the brief that I want to bring up. Well, it wouldn't make any sense for them to have six people negotiating the same deal with Total Coverage. I don't know quite what non-exclusive was intended to do. What I – But it – Either the contract gave my client some rights or it didn't. If it didn't, which apparently they're arguing and which apparently your questioning suggests, then it's illusory and it's not effective in that regard anyways. I mean, we either had some rights by that contract or we had no rights. And they're contending we had no rights because it's non-exclusive. But where does the covenant of good faith and fair dealing come into play here? There has to be fairness. There has to be reasonableness. There has to be no inappropriate conduct that deprives us of all of our effort and work. Wait a minute. This is a written contract. Where is that? A written contract. Where are those expressions in the contract? Well, the law is very clear that there's an implied covenant of good faith and fair dealing in all contracts. Certainly. But then you run head-on into a term that's 180 degrees the opposite and you sign it. It's not 180 degrees the opposite, Your Honor. What the contract – what it says is we have a non-exclusive right to represent them. Okay. But it doesn't say that we're going to take your information and then enter into the contract ourselves and cut you out of your commission after you give us free service and analyze 29,000 deals. Did you see a real estate broker that took a – And that's why we have the procuring cause. – clause like that in a listing agreement? Of course. And most real estate brokers are non-exclusive. But if they're the procuring cause, then they're entitled to their compensation. You can't do that to a real estate broker. You can't hire a real estate broker, have them take you all over town and look at 23 properties and then thumb your nose at them and get your cousin, who's a real estate broker, to go represent you on the deal and make them money. There's an inherent unfairness about that. And that's exactly what's happened here. That is exactly what they're doing. And there's an implied covenant of good faith and fideling that they won't do that. It's wrong. For 90 days, 180 days a year, a real estate broker takes an exclusive or he doesn't advertise in any newspaper. For selling. But what about a purchasing agent? That happens all the time. One of my best friends is a real estate agent. They take people around. They show them these properties. And there's an inherent unfairness. Why do they have a written agreement at all? Why not just use these other contract rules? Well, the point was that the defendant provided a contract. Why were they privileging something? Well, you know, obviously, when a problem exists and you're looking back in hindsight, it's easy to attack and say they should have done this. I'm looking at the papers they show me. I mean, I wasn't a party to this transaction. I'm looking at the transaction from the presentation you made with a written agreement. Well, then, at the very least, there's fraud involved. If these people are telling them that they're going to, in good faith, allow them to represent them, even though it's not exclusive, there's still an implied covenant there, but all along they're intending to take their confidential information, their confidential analysis, use their free services, but never intending to actually go through them but to cut them out, then that's got to be fraud. There's just something inherently wrong when some company does this to some other company, when the company's the procuring cause, when they have a substantially identical deal. It's not fair. It's not right. And they are placed on notice in the complaint, the second amendment complaint, of facts that should give rise to some cause of action, whether it's breach of contract, whether it's some kind of quasi-contract, whether it's some kind of unjust enrichment, or whether it's some kind of fraud. There's something wrong here. And it's not fair and it's not right that a company should do that. All right. Why don't we hear from your opponents. Thank you, Your Honor. Thank you. May it please the Court. I'm Matt Hodel for Sendet Settlement Services Group. The Court is correct in asking about leave to amend. There has been no argument made in the papers submitted by the appellant on this appeal, nor in framing the issue. Let me ask you what your position is. Is it your position that if they brought you the deal you ultimately signed, that you could say, thank you very much, you've got us a great deal, now we're going to go do it directly? If they had been, if they had brought a deal that was fully acceptable to us and one that we approved, and that they, in fact, had negotiated the terms of those deals, in other words, they had done all the work and they had delivered it to us, then I suppose if this were a real estate case, as they argue. No, not a real estate case. This case. They do not allege. No, that's not what I asked you, what they allege. They said, had they brought you terms that were acceptable to you, and you then went to the other side, to T-Mobile, and said, these rates are fine, now we want to sign them directly with you. Could you do that? That's a different case, Your Honor. That's not the case. Now, come on. Are you going to answer the question or aren't you? I didn't ask you whether it was a different case. I asked you questions. That's why we're here. If you don't want to answer the questions, just sit down. No, I don't want to sit down, yes. Well, then answer the questions. You're asking me if they, in fact, were the procuring cause, if they had put the entire deal together, if every single term was one million. No, no, no. If they gave you the rates and said, these are the basic rates. No, no. They would not be entitled to it. Absolutely not. Because we then. All right. Go ahead. Why? Because they did not, if you assume procuring cause applies, and I believe that's the thrust of your question. I don't assume anything. I'm asking you what your understanding of this contract is. My understanding of this contract is they have a contract that gave them the non-exclusive right, which meant that my client reserved to itself the right to negotiate and to make a deal through its own efforts. And even after they had brought the deal that you wanted. But they. That's your understanding of the deal. They don't allege that. Those aren't the facts. And they have never claimed. I know they're not the facts. I'm trying to understand what you think this contract means. It means that no matter what they do. I believe this contract means, just as it says. Paragraph 1 of the right to negotiate says non-exclusive right to negotiate, blah, blah, blah, T-Mobile products, in all cases subject to the approval. Meaning they would have to bring a deal to us. And we would have to say, yes, we approve the deal. Thank you for negotiating it. Thank you for putting it together. And we hereby approve it. And we approve it in writing. That is what that would be required. But that is. You said no, thanks, or thank you very much. But we don't approve it. Goodbye. And you went out and signed the basically same agreement. They would be entitled to nothing. One could say they might be entitled to recover on a quasi-contract theory. In other words, and I want to be clear about why I'm agreeing with you, Judge, which is that you have put to me a hypothetical, which is they have done all the work. They have negotiated every term directly. And there's nothing left to do. And they bring it to us and we approve the deal. We say, yes, that's the deal we want. However, we then go around them and go directly to T-Mobile. I would say yes. That's about the only time I would agree with counsel that there's something wrong here. However, those are not the facts that were alleged. They were given three opportunities to do so. And for the appellate to say we could amend, we could be clearer, that's the first time they've ever said that here today in oral argument. They had three opportunities to state that. They had every opportunity to inform the district court that there were missing facts. They had every opportunity when they drafted their opening brief. And when you raised your question here today, Your Honor, I looked again at the statement of issues as structured, framed by the appellate. Nowhere in there do they say should we be given the right to amend to allege additional facts. And they have never made that point. Only upon the suggestion of the court that maybe that argument ought to be made have they followed the law. But that's just not the record in this case. And it's simply too late. This is a case, I also want to point out that there was some argument here today about there's something wrong because of the implied covenant in good faith and fair dealing. They have never appealed from the fact that the district court dismissed the implied covenant. That's another non-issue. They have no such claim. They have never appealed. They have never argued that the court should not have dismissed the implied covenant claim. A claim which rested on a theory which contradicted the allegations in the complaint. The implied covenant claim was you can't go around us and negotiate on your own. And it's paragraph 14 of the third attempt here, which is the second amended complaint. It's paragraph 14, which says my clients send it negotiated directly. That violates our contract. And the problem there is that they incorporate the written contract into their own allegations, and the written contract says it's a non-exclusive right. Let me ask you, first, two things about that phrase. Why are they described as a vendor when they're supposed to go and negotiate on your behalf and your purchases? I suppose they're going to act as the, in effect, as someone through whom we're going to buy us, we're going to buy services. Someone who's your agent, so for you to buy services is a vendor? Well, that's what he said they are, a non-exclusive vendor. I, the most important terminology here is non-exclusive. Well, a non-exclusive what? A non-exclusive vendor. A non-exclusive right to negotiate. It doesn't say non-exclusive right to negotiate. It says a non-exclusive vendor. It says in paragraph 1, Your Honor, CSSG, that's my client, hereby grants to CTC, that's them, the non-exclusive right to negotiate. That's right. But the clause on which you rely so heavily that it was non-exclusive doesn't say a non-exclusive right to negotiate. It says they're a non-exclusive vendor. I don't know what that means. No, no. I beg to differ. It says in the July 10th agreement, total coverage shall serve as the non-exclusive vendor on behalf of CSSG to negotiate. How does a non-exclusive vendor negotiate? A non-exclusive vendor is the vendor is the person you're buying from. Basically, it means we've given you the authority to go out and to negotiate. However, we have reserved to ourselves two things here. One is our own right to negotiate on our own behalf. And secondly, since we called them the non-exclusive vendor, we actually could go appoint other people to go negotiate on our behalf. Watch the second question I'm going to ask you. The first one, I think, is the answer is that this particular phrase makes no sense in this contract because they're not a vendor at all. The second question is what does non-exclusive mean? Did you mean that you were going to have other people go out and negotiate with T-Mobile at the same time, the same subject? Sure. So you're going to have five people going to T-Mobile and saying what rate are you going to give us? We know from the law of agency, which is certainly older than anybody in this room, that when you say non-exclusive, that means other people can do the very same thing. And that if you're an agent and you want to protect yourself and you want to take the principal power to negotiate on their own or to appoint other agents, then you use different words. I know what the term means. Practically, I've certainly never seen a term like that when you're asking somebody to say you're an actor. You're asking your agent to negotiate with the studio. You don't say to your agent, I'm going to have five other people go to the studio at the same time and negotiate the same contract. Oh, to the contrary. If you are the agent and the principal says, I'm going to authorize you, but I'm not giving you the exclusive, as the agent you know, wait a second, that means my principal can go directly to themselves or the principal can go hire another agent. The law has always required precise words. The precise words must be exclusive. Well, precise words mean nobody else. If you want to be precise, no one else can be a vendor. You're not the only vendor. They can have five vendors. We could, in fact, have other people running around negotiating. As vendors. Well, you would read the fact that the... You want to use precise language. The verbs here are to negotiate and to obtain. Those are the verbs here. You're talking about a noun, which I don't think really changes. Nouns don't have to be precise, only verbs. But the verbs are very important. Great. Nouns, that's so good. But the verbs here are about negotiating, and it is not exclusive. The whole case theory by the plaintiff here contradicts the very language of the contract. I don't think there's any question, aside from the imprecision of the language, that if they didn't get you a deal, they would have no right claim against you. I have to differ again when you keep saying it's imprecise language. It is very precise language. No, I'm talking about the noun. Vendor? Yeah, vendor. They were not a vendor. There's no question about that. They were somebody who we gave authority to, but we said we are... But you're non-exclusive. I understand that. Only you are unnoticed, that there are other... Okay, but let's forget that for the moment. And what I said, there's no question under this contract that if they didn't bring a deal to you, they would have no claim. Correct. Okay. You had a right, at least until a certain point, to go make your deal directly. And you acknowledged that at a certain point, you would no longer have that right. Was... And the only question seems to be that they have not claimed that they reached that point in any... at any point until this morning. Of course. How could I disagree with you? Where they've done all the work, and they've brought the deal, and we authorized the deal. Of course the law ought to reward them at that point. But that's not what happened according to their own allegations. And they've had every opportunity to pound more facts in there, to give something else, and to even articulate what that would be through an offer of proof, which they have never offered to the trial court, nor have they offered to this court. You know, what's interesting is they agree the deal was a non-exclusive deal. They, in fact, allege that. And, you know, they moved to reform the contract. I think it's their tenth claim for relief. And they moved to reform it to say that it was really one sendent that was authorized to sign the contract. They never moved to reform to say that the parties really intended that this be exclusive. So what we are left with, just the basic landscape of this case, is a non-exclusive right to negotiate on our behalf. And they have already alleged that we went and negotiated directly. And that's not a procuring cause allegation. And I do, because I think you're concerned about procuring cause. The case law on this, California court in Nelson v. Mayer, which we cited, it's 1954, but it's still pretty basic law. It talks about how that Nelson's efforts were required to be the procuring cause of the sale, not merely one in a chain of causes. It is not enough that the broker contributes indirectly or incidentally to the sale by imparting information, which tends to arouse interest. He must set in motion a chain of events which, without break in their continuity, cause the buyer and seller to come to terms as the proximate result of his peculiar activities. Nelson did not affect the sale of the property. He did not put the buyer and seller together or cause a meeting of the minds on the terms thereof. Those aren't the allegations here. And we already know that the contract says it's something we have to approve. What they say here is that if you give them every benefit, the most liberal construction of what they're trying to communicate, is that we use some information. They claim that they analyzed 29,000 cell phone lines. Now, okay, let's accept that as true. That's what the ---- A somewhat later case in that from the California Supreme Court says, if the broker's efforts result in a meeting of the minds between the buyer and the seller, but the final negotiations and conclusion of the sale are conducted by them without the aid of the broker, he will still earn his commission. Whether the broker was the procuring cause and the motivating force of the sale is a question of fact to be determined from all of the circumstances surrounding each case. But they don't allege that. They have never alleged that. They have never claimed that they put it all together. They have never claimed that we just jumped in at the end and just closed the deal ourselves. We always reserve the right to ourselves to go out and negotiate this. And paragraph 14 of this complaint couldn't be more clear about what they have chosen to do. This is a case where you have very clear language and the lessons that the cases teach in California about where you want a contract where you claim it was a contract to sell a dog, but it really was, even though the contract says you're buying a cat and the cat's name is Felix, it really was a contract to sell a dog. And even though I've got a cat named Felix, you have got to understand that your words must have legal significance. And if you're going to claim that this really was exclusive, that we cannot negotiate on our own, then you have to use different words. And you can't use other theories, fraud. You can't use intentional interference. You can't convert this into a tort. You must live with the contract the way that it is written. And that's been the law to this day and this court, the Ninth Circuit in the Brindison v. Newberg case, which the trial court cited here, talks about how where there are significant terms, pivotal terms in a case, not just words like vendor, with all due respect, but important terms, that you cannot come up with a case theory where you try to say that this is the complete opposite, that if you come up with that, it must be a radical exception under the law, and there better be detailed pleading and a radically different case than has been presented here by this enormously simple case with an enormously simple contract with a very clear warning where they alleged three times that we negotiated, that we did, in other words, the very thing that we were allowed to do under this contract. Thank you, Your Honors. Thank you, Counsel. I'm just very brief, Your Honors. I don't believe today is the first day we requested leave specifically to say that the contract was substantially identical. But if you look at the pleading, Paragraph 10 of our Second Amendment complaint, although not worded as artfully as it could have been, we allege, although plaintiff fully performed all of its obligations under the agreement and had the right to negotiate on behalf of the defendant, contacted T-Mobile directly and entered into a deal for its cellular service. What we should have said was entered into a substantially identical deal. But they're put on notice, and the notice pleading rules would allow us to go into that, especially when you look in our oppositions to their motions to dismiss. This isn't the first brief where we brought in procuring costs. That was something that was brought up in the earlier briefs. They have general notice that we are contending that we were the procuring cause. What did the district court say to that argument? Well, she took the matter under submission without oral argument, and she ruled against us in her ruling. Did you make it precisely true in your moving papers? Yes, we absolutely did. That specific argument? The procuring cause argument? Yes. Absolutely. It's in the record. I'll show you. You said you had a complete offer ready to close? No, no. What we said was that we were the procuring cause. So what I'm saying is by suggesting that you're the procuring cause. You ran ahead in the newspaper so they called you up once and that's all it takes? Well, no. But, again, at the pleading stage, all we're looking at is whether or not there are facts that could give rise to coverage. Now, we may have proof problems at trial. That may be a question of fact as to whether we actually were the procuring cause. What did we do? How close was the deal? You know, you've been through this twice in the district court, and she did give you leave to amend, and you knew precisely and clearly what the issues were. And then the question is, is that a clear pleading of what your position is, or do we have to fill in the blanks? Well, frankly, Your Honor, I think the Court was wrong on both times. I think our first pleading stated a claim upon which relief can be granted. And I think our second amended complaint as worded states a claim upon which relief can be granted. And I think if we add a chance to amend it again, we can make it even more clear by adding the fact that a substantially identical deal was entered into. But, again, when you're looking at pleadings, you're supposed to put them generally on notice of the claims that you're asserting. I just think that the lower court was wrong on both occasions, because I think we have stated a claim. Are you contending that simply because you provided the ascendant with all of the information you did and did all of the work you did for them that you're thereby entitled to a commission if they then went out and negotiated a deal? I think not. As you exactly worded it, I would say no. I think there was more than that. I think that based on using our confidential procedures for analyzing their phone records to determine how we could best get them the best deal. In other words, by looking at 29,000 phone lines, we're looking at where they're calling, when they're calling, and we're using our trade secrets in formulating the best plans and strategies for them. We then give them those plans and strategies, and then they thumb their nose at us and say, oh, negotiate that deal behind our back. Yeah, there's liability there. If we had just come to them and said, oh, I think we can get you this or that, and hadn't analyzed and hadn't used our confidential information, our trade secret information, and some other company, ABC Store, had said, hey, I can get you even a better deal, and they'd gone to ABC and ABC got them a better deal, hey, you know, it's a non-exclusive contract. We're not saying it's an exclusive contract. We're conceding it's a non-exclusive contract. But we're saying that the obligation of good faith and fair dealing obligates them to not inappropriately use our trade secrets. Kennedy. Are you saying once you gave them the trade secrets, it became an exclusive contract? No. No. What I'm saying is once we gave them the trade secrets, it prevented them from using that information against the trade secrets. Well, what prevented them? I mean, what in the world? Where does it say that? Well, I think you have to imply it by the covenant of good faith and fair dealing, that they won't deprive any party of its benefit under the bargain. But let's say we had given them all the trade secrets, we'd done our analysis, and they said, okay. And then they go to Company B and say, what can you do for us? But don't give Company B any of that information. And Company B came back with a better deal. They were free to go with Company B. We wouldn't have any right to complain. So just by the fact of us doing the analysis doesn't mean we earned any. Well, you do the analysis, and then you put the whole package together, and you submit it to the seller, and they don't sign it. I can see where you may be entitled to a commission. But there's no allegation as to the point that you went to that extreme extent where everything's all drafted up, and there's a bow on top, and the signature of the buyer, and here it is. You'll make a million on this. Just sign it, and you got it. Right? And you've got your commission. Then again, Your Honor, it's purely a result of inartful articulation in the pleadings, because when you just look at our opposition to their motion to dismiss, we spent a great deal of time talking about procuring cause. Inferential in that is that we were the procuring cause, and that we did the work. Did you draft the agreement? No. The purchase? The defendant. Oh, did we draft the agreement with T-Mobile? Yeah. No. Okay. Thank you, sir. Thank you, Your Honor. The case just argued will be submitted. That's the end of the oral arguments for this morning. The Court will stand in recess today. Steve, you dropped a pencil. A pencil? Let it go. Okay. Yeah. Thank you. Thank you.
judges: Reinhardt, Beezer, Henderson